**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. _____


SANJAY ISRANY,
on Behalf of Himself and All Others Similarly Situated,

          Plaintiff,

       - against -

VENOCO, INC., TIMOTHY M. MARQUEZ,
J.C. MCFARLAND, JOEL L. REED,
DONNA L. LUCAS, M.W. SCOGGINS,
RICHARD S. WALKER, and MARK A. SNELL,

          Defendants.

_____

**STOCKHOLDERS' CLASS ACTION COMPLAINT**
_____

Plaintiff, Sanjay Israny, by his attorneys, alleges upon information and belief (said information and belief being based, in part, upon the investigation conducted by and through undersigned counsel of various SEC Filings, news articles, press releases and analyst reports), except with respect to Plaintiff's ownership of Venoco, Inc. ("Venoco" or the "Company") common stock and Plaintiff's suitability to serve as class representative, which is alleged upon personal knowledge, as follows:

**<u>NATURE OF THE ACTION</u>**

1.     Plaintiff brings this action individually and as a class action on behalf of all persons, other than defendants, who own the common stock of Venoco and who are similarly situated for compensatory damages and injunctive relief arising from the proposed transaction

described below (the "Class"). Alternatively, in the event that the proposed transaction is consummated, plaintiff seeks to recover damages caused by the breach of fiduciary duties owed by the Director Defendants (as defined below). The proposed transaction and the acts of the Director Defendants, as more particularly alleged herein, constitute a breach of defendants' fiduciary duties to plaintiff and the Class and a violation of applicable legal standards governing the defendants.

2. This action arises from breaches of fiduciary duties in connection with the proposed management-lead takeover transaction (the "Proposed Transaction") for grossly inadequate consideration, which is the product of a flawed and insufficient process. As more fully described below, the Proposed Transaction was initially proposed in a letter sent by Timothy M. Marquez ("Marquez"), the Company's largest and majority shareholder as well as the Chairman of the Board and Chief Executive Officer ("CEO"), on August 26, 2011, to the Board of Directors, which provided for the proposed acquisition of the outstanding shares not owned by Marquez for a consideration of $12.50 per share in cash.

3. On January 17, 2012, Venoco announced that it had agreed to be taken private by Marquez for the previously announced consideration of $12.50 per share. Plaintiff alleges that he and the other public shareholders are entitled to enjoin the Proposed Transaction or, alternatively, to recover damages in the event that the Proposed Transaction is consummated. The negotiation and structure of the Proposed Transaction are the result of a wholly inadequate process and supervision of and by an ineffective special committee. If consummated, the Proposed Transaction will result in the denial of the shareholders' right to participate in the Company's future growth and earnings, which have been touted by Marquez and Venoco. Under

the circumstances, and in light of the facts underlying the Proposed Transaction, the decision of the Director Defendants (as defined below) to consider and agree to the terms of the Proposed Transaction constitutes a breach of their fiduciary duties to Plaintiff and the other Venoco shareholders.

## PARTIES

4.      Plaintiff Sanjay Israni, citizen of the state of New Jersey, has been an owner of shares of defendant Venoco common stock since it went public in November of 2000.

5.      Defendant Venoco is incorporated under the laws of Delaware and maintains its corporate headquarters at 370 17th Street, Suite 3900, Denver, Colorado, 80202. Venoco is an independent energy company, which engages in the acquisition, exploitation, exploration and development of oil and natural gas properties. Its principal properties are located onshore in California's Sacramento Basin and both onshore and offshore of southern California. Venoco's common stock trades on the New York Stock Exchange under the ticker symbol "VQ" and as of September 30, 2011, the Company had 61,607,796 shares outstanding. Marquez is holds 50.3% of Venoco stock – making him the majority shareholder.

6.      Marquez currently serves as the CEO and Chairman of the Board of Directors. Marquez co-founded Venoco in September 1992 and served as the Company's CEO from the formation through June 2002. In 2002, Marquez founded Marquez Energy and served its CEO until it was acquired by Venoco in March 2005. Marquez returned to Venoco as Chairman of the Board, President and CEO in June 2004. Marquez is the majority stockholder of the Company with his holdings amounting to 50.32% of the Company's outstanding stock,

according the Form 13D/A filed by Marquez with the United States Securities and Exchange Commission ("SEC") on August 29, 2011.  Marquez is a citizen of Colorado.

7.      Defendant J.C. McFarland ("McFarland") currently serves as a Venoco director and has served in such a capacity since June 2004.  According to Venoco's Annual Proxy States filed with the SEC on Form DEF 14A on April 27, 2011 (the "2011 Proxy"), MacFarland also serves as the Chair of the Company's Audit Committee and is a member of the Compensation Committee.  McFarland is a citizen of California.

8.      Defendant Joel L. Reed ("Reed") currently serves as a Venoco director, has served in such a capacity since August 2005 and previously served in such capacity from September 1998 through March 2002.  Reed is the Company's Lead Independent Director.  As provided in the 2011 Proxy, Reed also serves as the Chair of the Company's Corporate Governance/Nominating Committee and is a member of the Audit Committee.  Reed is a citizen of California.

9.      Defendant Donna L. Lucas ("Lucas") currently serves as a Venoco director and has served in such a capacity since February 2009.  As provided in the 2011 Proxy, Lucas is a member of the Company's Corporate Governance/Nominating Committee.  Lucas is citizen of California.

10.      Defendant M.W. Scoggins ("Scoggins") currently serves as a Venoco director and has served in such a capacity since June 2007.  As provided in the 2011 Proxy, Scoggins is a member of the Company's Corporate Governance/Nominating Committee. Scoggins is a citizen of Colorado.

11.     Defendant Richard S. Walker ("Walker") currently serves as a Venoco director and has served in such a capacity since June 2007.  As provided in the 2011 Proxy, Walker is a member of the Company's Audit Committee and Compensation Committee.  Walker is a citizen of Illinois.

12.     Defendant Mark A. Snell ("Snell") currently serves as a Venoco director and has served in such a capacity since December 2006.  As provided in the 2011 Proxy, Snell is Chair of the Company's Compensation Committee.  Snell is a citizen of California.

13.     The individual directors of Venoco described above are collectively referred to herein as the "Director Defendants."

14.     The Director Defendants owe fiduciary duties including good faith, loyalty, fair dealing, due care, and candor, to Venoco and its shareholders.

15.     The Director Defendants, by reason of their corporate directorships and/or executive positions, are fiduciaries to and for the Company's stockholders.  This fiduciary relationship requires them to exercise their best judgment, and to act in a prudent manner and in the best interests of the Company's stockholders.

16.     Each Director Defendant herein is sued individually, as a conspirator and aider and abettor, as well as in his or her capacity as an officer and/or director of the Company, and the liability of each arises from the fact that he or she has engaged in all or part of the unlawful acts, plans, schemes, or transactions complained of herein.

**JURISDICTION AND VENUE**

17.     This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332, because the amount in controversy exceeds $75,000 and there is complete diversity of

citizenship between the Plaintiff, a citizen of New Jersey and the Defendants, who are citizens of Delaware, Colorado, California, and Illinois.  *See* 28 U.S.C. § 1332.  In this action, Plaintiffs seek to enjoin a transaction that values Venoco at approximately $1.2 billion and, alternatively for damages in excess of $75,000.  Accordingly the amount in controversy requirement is met.

18.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) because many of the acts and practices complained of herein occurred in substantial part in this District, Venoco maintains its corporate headquarters in this District, and two of the Director Defendants reside in this District.

## CLASS ACTION ALLEGATIONS

19.     Plaintiff, a shareholder of the Company, brings this action as a class action pursuant to Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of himself and all public common stockholders of the Company.  Excluded from the Class are defendants, members of the immediate families of the defendants, their heirs and assigns, and those in privity with them.

20.     This action is properly maintainable as a class action for the following reasons:

a)     The Class of shareholders for whose benefit this action is brought is so numerous that joinder of all Class members is impracticable.  According to the Form 10-Q the Company filed with the SEC on November 1, 2011, as of September 30, 2011, there were 61,617,933 shares of Venoco common stock issued and outstanding and approximately more than 30 million not owned by Marquez.  Upon information and belief, Venoco common stock is owned by thousands of shareholders of record scattered throughout the United States.

b)      A class action is superior to other methods for the fair and efficient adjudication of the claims asserted herein, and no unusual difficulties are likely to be encountered in the management of this action as a class action.  The likelihood of individual Class members prosecuting separate claims is remote.

c)      There are questions of law and fact which are common to members of the Class and which predominate over any questions affecting any individual members.  The common questions include, *inter alia*, the following:

(i)      Whether Marquez has engaged in a plan and scheme to enrich himself at the expense of Venoco public stockholders;

(ii)      Whether the Director Defendants have breached their fiduciary duties owed by them to Plaintiff and members of the Class, and/or have aided and abetted in such breach, by virtue of their participation and/or acquiescence and by their other conduct complained of herein;

(iii)      Whether defendants have failed to fully disclose the true value of Venoco assets and earning power and the future financial benefits which Marquez will obtain from the completion of the Proposed Transaction;

(iv)      Whether the Director Defendants have wrongfully failed and refused to seek a purchase of Venoco at the highest possible price and, instead, have sought to chill potential offers and allow the valuable assets of Venoco to be acquired by Marquez at an unfair and inadequate price;

(v)      Whether Marquez has induced or aided and abetted breaches of fiduciary duty by members of Venoco's Board of Directors;

(vi)     Whether Plaintiff and the other members of the Class will be irreparably damaged by the Proposed Transaction; and

(vii)    Whether defendants have breached or aided and abetted the breaches of the fiduciary and other common law duties owed by them to Plaintiff and the other members of the Class.

21.     Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature.  The claims of Plaintiff are typical of the claims of the other members of the Class and Plaintiff's interests align with those of the other members of the Class.  Accordingly, Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

22.     Plaintiff anticipates that there will not be any difficulty in the management of this litigation.

23.     For the reasons stated herein, a class action is superior to other available methods for the fair and efficient adjudication of this action.

## SUBSTANTIVE ALLEGATIONS

24.     Despite a volatile and challenging global and domestic economic climate, Venoco has managed to maintain steady results and is well-positioned for strong growth in the future.

25.     On February 22, 2011, Venoco issued a press release announcing its 2010 year-end and 4Q results.  The Company reported net income of $68 million and total revenues of $295 million for 2010.  Additionally, adjusted EBITDA was $218 million up 10% from 2009

when adjusted EBITDA was reported as $190 million.  In the press release, Marquez stated the following regarding the Company's results:

> "Last year we invested in the science of the onshore Monterey shale and I'm pleased with the progress we've made in that area. I'm also happy with the results we saw from focusing on costs at our legacy assets. We were able to beat our LOE guidance while keeping production within 2% of guidance," said Tim Marquez, Venoco's Chairman and CEO. ***"We believe we've made good progress advancing the science in 2010 on the Monterey shale, and see 2011 as the year we begin to execute on the development."***

> [Emphasis added.]

26.    The day following the announcement, February 23, 2011, the Company's stock price closed at $18.24 per share.

27.    On May 5, 2011, Venoco issued a press release announcing its 2011 1Q results.  The Company reported a net loss of $24 million, which was primarily the result of an unrealized commodity derivative loss of $33 million and a one-time realized loss of $38 million related to the Company's interest rate swap, which was settled as a result of the Company's first quarter 2011 refinancing.  Further, adjusted EBITDA was $51 million for the quarter on oil and natural gas reserves of $78 million and realized commodity derivative gains of $5 million.  Thus, the one-time losses were not indicative of the future of Venoco, which remained strong and was illustrated by the statements of Marquez in the press release, which are provided in pertinent part:

> "Our production base from legacy Southern California and Sacramento Basin assets has started the year well," said Tim Marquez, Chairman and CEO. ***"In the Sacramento Basin we've had success drilling two of three seismic anomalies, which we***

*expect will be a positive contribution to 2011 production volumes*. This month we also kicked off wellwork and drilling at Platform Gail and we are preparing to spud our first of several wells at West Montalvo."

\*                              \*                              \*

"While to date we have not seen significant cumulative production as a result of our drilling in the onshore Monterey, we have been encouraged by the scientific information collected thus far. After extensive logging, coring and testing we have accumulated sufficient data from our vertical wells to announce discoveries in our Sevier prospect in Kern County and in our Salinas Valley prospect," said Mr. Marquez. *"We believe the resource potential in Sevier is approximately 90 MMBOE on 20-acre spacing and approximately 44 MMBOE on 40-acre spacing in the Salinas Valley."*

\*                              \*                              \*

*"With the refinancing we have pushed debt maturities out five or more years and provided Venoco with additional liquidity.* Since the beginning of 2010, including selling our Texas assets, we have reduced debt by $52 million while maintaining relatively flat production from legacy assets and shifting our capital focus to build our position in the onshore Monterey shale play," Mr. Marquez explained.

[Emphasis added.]

28.     The day following the announcement, May 6, 2011, the Company's stock closed at $15.75 per share.

29.     On July 11, 2011, Venoco was upgraded by Pritchard Capital Partners, LLC from a "Neutral" to a "Buy" rating based on valuation analysis and assigned the Company a target price of $19.00 per share. The upgrade indicated that Pritchard believed the Company was significantly undervalued at the price of $13.66 per share, which it was trading at on July 11, 2011.

30.     On August 2, 2011, Venoco issued a press release announcing its 2011 2Q results.  The Company reported net income of $19 million and adjusted EBITDA of $58 million, which was up 14% from 1Q 2011.  Lease operating expenses were down 3% from 1Q 2011 to $13.14 per BOE.  In the press release, Marquez made the following statements regarding the results, in pertinent part:

> "After minimal activity in the first quarter in our oily Southern California legacy properties, we became quite active by the end of the second quarter and expect higher activity levels for the remainder of the year," commented Tim Marquez, Chairman and CEO. ***"It's an exciting time for the company; oil prices are strong (with California prices exceeding WTI), we have excellent liquidity, and a significant inventory of proven oil projects to pursue. The potential of our legacy Southern California assets has been somewhat overshadowed by the enormous potential we see with the onshore Monterey shale, but we're equally as excited about these properties and expect to pursue a number of development projects during the second half of this year and in 2012."***

> [Emphasis added.]

31.     Further, as provided in the August 2, 2011 Venoco press release, the Company announced positive news regarding its future potential for growth, which could be realized as early as 2012.  The press release provides, in pertinent part:

> **2011 Activity**

> ***The company is currently operating one rig in its Monterey shale play and is working to identify and secure up to four additional rigs by year-end 2011. The increase in rigs would be in anticipation of much greater activity in 2012 when the company currently expects it may run six to eight rigs in the play and spud between 50 and 75 primarily vertical wells, as warranted by drilling and production results.*** 2012 drilling activity will be focused on delineation and development wells in the company's Sevier discovery, in the area covered by the company's joint 3-D seismic shoot (with Occidental Petroleum) in the San Joaquin

Valley and, after completion of an anticipated 3-D seismic survey, in the Salinas Valley.

"We are shoring up our development plans for the Sevier discovery and have been in contact with the agencies to ensure we have a clear path forward to develop this discovery. We currently expect to drill 30 to 40 wells there next year," said Mr. Marquez.

"We were pleased to see the recent U.S. Energy Information Administration's assessment of emerging resource plays, which confirms a lot of what we've been saying about the Monterey's resource potential. ***Not only is the Monterey shale the largest overall play, it also dwarfs all other individual U.S. oil shale plays. According to the EIA, at 15.4 billion barrels the Monterey shale represents 64% of the technically recoverable shale oil resources in the lower 48 states,***" commented Mr. Marquez.

In the Sacramento Basin the company has 457 proved, booked locations engineered by its independent reserve auditors on 20-acre or greater spacing and has identified over 150 additional 20-acre locations. The company has now drilled almost 100 10-acre spaced wells in the Forbes formation and believes the results prove the 10-acre concept in the play. The tighter spacing means that in addition to the 600+ 20-acre locations, the company has hundreds of potential 10-acre spaced locations. In order to accelerate the net present value of this enormous resource, the company plans to increase drilling activity to previous levels of approximately 100-120 wells per year once gas prices appear to be steady at or above $4.50/MCF. In total, the company believes that the infill potential represents about 680 BCF of technically proved resources, which the company believes would be considered reserves in the absence of the SEC five-year rule.

"We have a highly successful track record in the Sac Basin but in light of weak gas prices, we decided to constrain our Sac Basin activity in recent quarters. With prices now firming, I see an opportunity to accelerate our manufacturing process of drilling wells in the Basin and the potential to double our production in a couple years. ***If prices stabilize at an acceptable level, we currently plan to roughly double drilling rates next year and eventually build up to 200 to 300 wells per year,***" said Mr. Marquez.

In addition to the tremendous opportunity with further downspacing in the Sacramento Basin's Forbes formation, the

company has also drilled and tested nearly two dozen wells to de-risk the deeper Guinda formation. The company estimates the net resource potential in the company's Willows field area is approximately 600 BCF based on about 900 locations and over 260 BCF based on about 400 locations in the company's Greater Grimes area.

Regarding the company's South Ellwood onshore pipeline project, the final Environmental Impact Report has been issued by the County of Santa Barbara and approval hearings are currently scheduled to begin in early August and may be finalized in the third quarter. The 8.5 mile pipeline will replace the double-hulled barge that is currently used to transport crude oil produced from the South Ellwood field. Once the project is approved, the company believes it will be able to add proved reserves at the South Ellwood field of at least 7 million barrels that are currently not recognized by the company's independent reserve engineers. In addition, the company expects to reduce transportation costs from the field by approximately $2 per barrel and eventually realize an additional $3 to $5 per barrel of oil sold as a result of access to a greater number of crude oil purchasers.

\*                              \*                              \*

## 2012 Outlook

The company's average oil realizations in 2012 are expected to improve as a result of the March 31, 2012 expiration of certain crude oil sales contracts tied to NYMEX West Texas Intermediate (WTI) pricing. Approximately half of the company's crude oil is sold under those contracts, while the balance is sold on contracts tied to California posted prices, which have exceeded WTI by up to $13 per barrel during 2011. The company's average 2010 realized oil prices were approximately $10 per barrel less than WTI; however, with the recent higher California postings its average oil price realizations in the first half of 2011 have improved to approximately $6 less than WTI. *As the company's WTI based contracts expire in 2012 and based on current forward strip pricing, the company believes its average realized oil prices in 2012 will exceed WTI by approximately $7 per barrel.*

Venoco continues to monitor progress at the Hastings field where it has a reversionary interest in the large $CO_2$ flood being implemented by Denbury Resources. The company believes its

share of reserves associated with the flood could eventually be up to 40 million BOE. As expected, the field is currently shut-in to build pressure from the CO2 flood and is expected to return to production late in 2011. ***Depending on the timing and level of response from the CO2 flood, the company believes a portion of its 15.2 million BOE of engineered probable reserves may be reclassified as proven reserves by year-end 2011.***

***When the Hastings field reaches payout for Denbury, Venoco will earn, at no cost, a 22.3% working interest in this large producing oil field.*** Venoco currently estimates that the CO2 flood will reach payout in approximately 24 months using $100 per barrel oil pricing. The company also estimates that a sustained decrease in oil pricing of $10 per barrel would extend payout by approximately 4 months. The company currently expects to explore marketing its interest in the field in 2012 after response to the CO2 flood has been demonstrated.

"With higher world-wide oil prices and strong California pricing, we expect 2012 can be both a year of increased drilling activity and, with strong cash flow and the potential sale of Hastings, greatly improved debt metrics," said Mr. Marquez. ***"We have a tremendous amount of value we are focused on unlocking."***

[Emphasis added.]

32.     Thus, it is clear that Marquez recognized the value in the future of Venoco. The future was indeed bright as the Company was poised for substantial success and growth in 2012 as a result of unlocking the "tremendous amount of value" the Company held.

33.     On August 8, 2011, the S&P downgrade of the U.S.'s credit rating resulted in a mass-sell-off resulting in the worst day for the economy since the 2008 financial crisis. Investors were already taking a precautionary approach in the weeks prior to August 8, 2011, as in totality U.S. stocks fell 15% in the two weeks prior. This uncertainty negatively effected Venoco and caused the price of the stock to fall, however, it is apparent such a fall was not the result of its earnings or growth prospects.

**An Opportunistic Proposal**

34.     On August 29, 2011, the Company issued a press release, announcing that Marquez had made an offer to acquire the outstanding shares of the Company that he did not already own.  This offer would prevent the shareholders from participating in and reaping the benefits of the "tremendous value" the Company was expected to unlock in 2012.  Marquez clearly was attempting to capitalize on the Company's stock price, which was suffering from the effects of a general economic downturn and market volatility.   The press release stated, in pertinent part:

> **DENVER, COLORADO, August 29, 2011** /Marketwire/ — Venoco, Inc. (NYSE: VQ) announced that its board of directors has received a non-binding proposal from Timothy M. Marquez, Chairman and CEO of the company and the holder of approximately 50.3% of Venoco's outstanding common stock, to acquire all of the outstanding shares of Venoco common stock for $12.50 per share in cash.  A copy of the text of the proposal letter to the Venoco board of directors is set forth below.
>
> In response, Venoco's board is in the process of forming a special committee of independent directors to consider the proposal, which will be comprised of all of the directors of the company other than Mr. Marquez. The committee will retain independent financial advisors and legal counsel to assist it in its work. The board of directors cautions Venoco shareholders and others considering trading in its securities that it has only received the proposal and that no decision has been made with respect to the company's response to the proposal. There can be no assurance that any definitive offer will be made, that any agreement will be executed or that this or any other transactions will be approved or consummated.
>
> *                              *                              *
>
> Directors:
>
> I am pleased to offer to acquire all of the outstanding shares of the common stock of Venoco, Inc. (the "Company") at a cash purchase

price of $12.50 per share. I believe that this offer is fair and in the best interest of the Company and its public shareholders and that the shareholders will find the proposal attractive. The offer represents a premium of 39% over the Company's most recent closing stock price on August 26, 2011 and a 27% premium to the average closing price in August 2011. Moreover, my proposal represents a total enterprise value to 2012 EBITDA multiple of 5.3x (using I/B/E/S consensus estimates) compared to the current median trading multiple of the Company's peer group of 3.9x 2012 EBITDA (using I/B/E/S consensus estimates).

The acquisition would be in the form of a merger of the Company with a new acquisition vehicle that I would form. I expect that the Company's senior management team would remain in place. I anticipate continuing to run the business in accordance with our current practice and maintaining the Company's valuable employee base, which I view as one of its most important assets.

I would expect to reinvest 100% of my equity ownership through this transaction. Although this offer is being made subject to obtaining financing on terms acceptable to me, I am confident that such financing can be obtained. I am preparing a draft merger agreement that I will provide to you shortly. The familiarity of the management team with the Company means that I will be in a position to complete limited, confirmatory due diligence and finalize the merger agreement very quickly.

I have retained Wachtell, Lipton, Rosen & Katz as my legal advisor. I expect that you will establish a special committee of independent directors with its own legal and financial advisors to review the proposal on behalf of the Company's public shareholders.

Of course, no binding obligation on the part of the Company or the undersigned shall arise with respect to the proposal or any transaction unless and until such time as definitive documentation satisfactory to me and recommended by the special committee and approved by the Board of Directors is executed and delivered.

I look forward to working with the special committee and its legal and financial advisors to complete a transaction that is attractive to the Company's public shareholders. Should you have any questions, please contact me

[signed: Timothy M. Marquez]

End of text.

35.    Marquez's proposal was to acquire all Venoco's common stock not currently owned by Marquez, for a consideration of $12.50 per share in cash.  Despite Marquez's observation that the proposed consideration was a 39% premium over the Company's most recent closing price on August 26, 2011, the fact is the offer significantly undervalues the Company and is an attempt to usurp it from its shareholders.  The consideration represents only a 9.2% premium from the closing price on August 3, 2011, (the day following announcement of the Company's 2011 2Q earnings) and a discount from where the stock traded on July 11 (an 8.5% discount), May 6 (a 20.7% discount) and February 23, 2011(a 31.5% discount).  Further, the consideration comes at a 44% discount of the Company's 52-week high of $22.46.

36.    Further, several financial analysts and reputable financial news sources issued price targets well above the offer price and criticized the offer as, at the minimum, opportunistic:

a)    On August 29, 2011, ISI Group issued a price target of $15.00 per share for the Company.

b)    On August 11, 2011, Stifel Nicolaus issued a price target of $24.00 per share for the Company.

c)    Global Hunter Securities issued a price target of $16.45 following the announcement of the Marquez proposal and stated that "we view the $12.50/share price as a significant discount to the value of the company's assets, even on a conservative basis…  At this level, you're buying proved reserves and legacy, low-risk assets including the South Elwood, West Montalvo, Sac Basin and the Hastings."

d)      Following the announcement of the Marquez proposal, according to a StreetInsider.com article, Stephen Berman of Pritchard Capital Partners, LLC thought the consideration undervalued the Company significantly and failed to properly provide for the value of Venoco's interest in the Monterey Shale.

37.      Thus, it is clear that the financial analysts saw value in this Company and great potential for growth.   Further, the analysts seemed to doubt whether the consideration properly reflected and accounted for the value of the Company's interest in Monterrey Shale and Hastings field.   The enthusiasm expressed by Marquez about these assets for 2012 in his statements contained in the August 2, 2011, press release would seem to suggest that he agreed with the financial analysts that there was significant value and potential for future growth from both assets.   However, Marquez's proposal failed to reflect such value in the consideration offered to the minority shareholders.

38.      The proposal of Marquez was a blatant attempt to capitalize on the recent drop in Venoco's stock price and usurp a valuable investment opportunity from the Company's shareholders.   The proposal was unquestionably an opportunistic attempt by a majority shareholder to obtain the outstanding shares of Company at a time when the recent market weakness and global economic downturn has negatively impacted the stock price, but not the underlying value of the Company.

39.      As provided in the 13-D filed by Marquez with the SEC on August 29, 2011, Marquez owns 50.3% of Venoco common stock and is solely interested in the acquisition of the shares held by the minority shareholders of the Company.   There was and is no indication that Marquez had or has any interest in the sale of his controlling interest in Venoco.

40.     On December 12, 2011, Venoco announced that it expects to increase oil and gas production next year while investing further in its operations.  Venoco forecasted that production would be between 17,750 and 18,250 barrels of oil equivalent per day in 2012, up from 17,500 on average in 2011.  In the announcement, Marquez was quoted as saying the following:

> *"We expect to see revenue grow considerably in 2012*, even on the modest production growth we are forecasting."

[Emphasis added.]

41.     Moreover, Marquez's attempt to seize complete control of the Company is not limited to the lull in the stock's performance and the market undervaluing the Company as a result of general economic factors.  Indeed, Marquez also wants to purchase the Company to take advantage of the natural gas cycle bottoming out.  In a *Bloomberg* report, "Natural Gas Prices Look for Bottom: 2012 Outlook" published on January 18, 2012, the Bloomberg Industry Natural Gas Production Team reported:

> As natural gas prices approach $2.00/MCF in 1Q and are sustained near these levels, announcements of reduced spending and shut-in of existing wells may follow, which typically marks the bottom of the natural gas cycle.  *In the four instances where this has occurred, relative outperformance in the sector followed in the next six to 12 months.*
>
> *     *     *
>
> *Natural gas prices have fallen at or near estimated cash cost of production four times in the past 10 years.  In the subsequent six to 12 months, prices for natural gas rose 44% and the underlying equities gained 68% outperforming the overall market by 47 percentage points on average.*

[Emphasis added.]

42.     Further, the Bloomberg Natural Gas Production Team reports that natural gas producers have been undeterred by low natural gas prices and decreased cash flow from gas production as the pace of development and drilling has not slowed.  Clearly, the natural gas production industry is betting on a rebound as development has not slowed.

43.     Marquez's comments in the August 2, 2011 press release reveal his long-term strategy regarding natural gas:

> We have a highly successful track record in the Sac Basin but in light of weak gas prices, we decided to constrain our Sac Basin activity in recent quarters.  With prices now firming, I see an opportunity to accelerate our manufacturing process of drilling wells in the Basin and the potential to double our production in a couple years. ***If prices stabilize at an acceptable level, we currently plan to roughly double drilling rates next year and eventually build up to 200 to 300 wells per year."***

44.     Marquez's strategy is clear: take advantage of record-low natural gas prices to position himself to reap the benefits, at the expense of the shareholders, of the increased production when prices inevitably rise.  This another example of Marquez recognizing future value in the Company and seeking to capitalize on that future value himself at the expense of the shareholders.  Marquez is seizing upon an opportunity brought about by a temporarily depressed market affecting the Company's assets and using this opportunity to make a low-ball offer to shareholders which fails to account for the true value of the Venoco's assets.

**The Board of Directors Accept the Marquez Proposal**

45.     On January 17, 2012, Venoco issued a press release announcing that it had entered into a definitive merger agreement ("Merger Agreement") with Denver Parent Corporation, a Marquez controlled entity, and accepted Marquez's offer of $12.50 per share for

all outstanding shares other than those owned by Marquez.  The press release stated as follows,

in pertinent part:

> DENVER, CO, Jan 16, 2012 (MARKETWIRE via COMTEX) -- Venoco, Inc. (NYSE: VQ), a leading independent energy company, announced that it has entered into a definitive merger agreement under which Timothy M. Marquez, Venoco's Chairman and CEO, who, together with affiliated trusts and foundations, holds 50.3% of Venoco's common stock, will acquire Venoco through a wholly owned entity, Denver Parent Corporation.
>
> Under the agreement, Venoco shareholders, excluding Mr. Marquez and his affiliated entities, will receive $12.50 per share in cash upon completion of the transaction. The price represents a premium of 63% to Venoco's closing price on Friday, January 13, 2012, the last trading day before the announcement of the transaction and a premium of 75% to the volume-weighted one-month moving average for that date, and implies a total enterprise value of approximately $1.5 billion.
>
> The special committee of the board of directors that was formed in August 2011 to review the proposal from Mr. Marquez, with the assistance of independent legal and financial advisors, completed a thorough review of the proposal, investigated various alternatives and other potential bidders, and unanimously concluded that the transaction with Mr. Marquez was in the best interests of Venoco's minority shareholders. Based on the unanimous recommendation of the special committee, the agreement was also approved by the full board other than Mr. Marquez, who abstained.
>
> Rick Walker, the Chairman of the special committee, stated, "After a thorough assessment, with the assistance of independent legal and financial advisors and after a comprehensive 5-month search of the market for superior alternatives, we concluded that this transaction will maximize value for our public shareholders. We are also pleased to have successfully negotiated a 'majority of the minority' approval right for our public shareholders."
>
> Mr. Marquez said, "I am pleased to announce this transaction, which I believe will deliver significant value to our public shareholders. I am proud of the strong track record of our company, and our valued employees who make that possible. This transaction will position Venoco for the long term and allow our

company to continue investing in its future in an era of continued economic uncertainty."

Completion of the transaction is subject to certain closing conditions, including receipt of shareholder approval, regulatory approvals, a financing condition and other customary conditions. The merger agreement contains a non-waivable condition that a majority of the outstanding shares of Venoco not owned by Mr. Marquez and his affiliates or by any director, officer or employee of Venoco or its subsidiaries vote in favor of the adoption of the merger agreement.

BofA Merrill Lynch and Strategic Energy Advisors, LLC are acting as financial advisors to the special committee, and Squire Sanders is acting as legal advisor to the special committee.

Wachtell, Lipton, Rosen & Katz is acting as legal advisor to Mr. Marquez, and Citigroup and BMO Capital Markets are working with Mr. Marquez on the transaction.

46.     The Merger Agreement and acceptance of the Marquez proposal are the result of a wholly inadequate process in which the majority stockholder, CEO and Chairman of the Board of Directors of the Company was able to exercise undue influence and control over the Board and the Company.   As a result of Marquez's considerable influence, the Director Defendants and/or any Special Committee cannot safeguard the interest of Venoco's minority shareholders and could not prevent the breaches of fiduciary duties that have occurred.   The Director Defendants were unable to negotiate and maximize shareholder value and were unable to conduct and complete a proper process.

47.     Further, there is no evidence that Director Defendants considered any viable strategic alternative, including, but not limited to seeking out another potential buyer or simply rejecting the patently inadequate Marquez proposal and continuing as public company. The Director Defendants and Venoco have remained silent as to any value or advantage this deal

presents to shareholders, who were on the verge of enjoying the future growth that Marquez and Venoco had represented on August 2, 2011.  Moreover, it should be noted that despite the nearly five months that passed, where negotiation would presumably have taken place, there has been no increase in the consideration to minority shareholders, nor any news of any potential strategic alternative for the stockholders.

48.     The Merger Agreement contains several onerous deal protection devices when taken together further render this Proposed Transaction a *fait accompli*.  The Merger Agreement contains a $10 million dollar termination fee and a no-solicitation clause, and it includes a voting agreement signed by Marquez and his affiliates.  The presence of such deal protection devices eliminates any potential for a competing offer to emerge and effectively caps the consideration that the Company's minority shareholders could receive at $12.50 per share.

49.     The no-solicitation clause prevents any representative, including the Director Defendants, from even initiating or soliciting any alternative proposal from any other potential bidder as well as even engaging in discussions regarding the formation of any alternative proposal.  Further, the Company's representatives are forbidden from engaging in discussions concerning the production of any non-public information.  Thus, any potential rival bidder must be willing to overcome a *fait accompli* transaction with an unsolicited offer without the benefit of any nonpublic information.

50.     The voting agreement will produce a majority vote of the common stock of Venoco, which, as the Company touts in the press release, is only one-half the required shareholder action because of the requirement that a "majority of the minority" approve the Proposed Transaction.  However, this "majority of the minority" provision does not render the

Transaction or the process fair to the Company's minority shareholders as Marquez will only require 25% of the outstanding shares to vote in his favor.

51.     The Company is still wholly undervalued in the Proposed Transaction, as supported by the statements of Marquez and various financial analysts.   The inadequate consideration first proposed in August 2011 has not budged, despite nearly five months of supposed negotiating, due to the influence and control exercised by the Company's majority shareholder, Marquez.   Further there is no evidence suggesting that a proper process was ever conducted and that any, much less all, possible strategic alternatives were ever considered, including the option of remaining a publicly-traded corporation.   Moreover, the Company's failure to reject such a blatantly opportunistic offer on its face and its acceptance of the same offer – unchanged– five months later shows the degree of control and influence Marquez has exercised and will continue to exercise over the Director Defendants and the Company.

**Analysts Express Skepticism at Announcement of Proposed Transaction**

52.     On January 16, 2012, J.P. Morgan issued an alert entitled "Surprised the Board Accepted the Take-Private Offer of $12.50."   Analysts at J.P. Morgan noted that management-guided NAV was from $63.81 per share to $141.24 per share as recently as March 2011.

53.     J.P. Morgan analysts also pointed out that the $12.50 per share offer implies an enterprise value of $1.5 billion, but management's analysis in March 2011 implied a total enterprise value of ranging from $5.1 billion to $9.9 billion.

54.     J.P. Morgan analysts announced in the January 16, 2012 release that their NAV is **$19.48** per share and explained: "Our 12-month target reflects our skepticism about the

deal and doubts that the company would commercialize the Monterey Shale by YE12.  But our NAV assumes that VQ ultimately would commercialize at least part of its Monterey acreage, just not by YE 2012."

56. J.P. Morgan analysts added "we think opponents [of the Proposed Transaction] would have strong arguments."

56. Thus, the Director Defendants have breached their fiduciary duties by failing to attempt to maximize shareholder value and to ensure a proper process to protect the interests of the minority shareholders.  The Director Defendants have agreed to a deal, which benefits only the controlling shareholder, Marquez, to the detriment of the Plaintiff and the Class.

**The Director Defendants' Fiduciary Obligations**

57. The Director Defendants' fiduciary obligations under these circumstances require them to:

a) Undertake an appropriate evaluation of Venoco's worth as a merger candidate or in liquidation;

b) Engage in a meaningful auction with third parties in an attempt to obtain the best value for Venoco's public shareholders;

c) Act independently so that the interests of Venoco's public shareholders will be protected and enhanced;

d) Undertake a valuation of the liquid value of Venoco's assets were they to be disposed of piecemeal in a liquidation auction; and

e)      Disclose fully and completely all material information during consideration of the Proposed Transaction.

58.     The terms of the Proposed Transaction as now proposed are unfair to the Class, and the unfairness is compounded by the disparity between the knowledge and information possessed by the Director Defendants by virtue of their positions of control of Venoco and that possessed by the Company's public shareholders.

59.     The Director Defendants' failure to immediately reject the facially inadequate Marquez proposal described in the letter sent by Defendants Marquez evidences their disregard for ensuring that shareholders receive adequate value for their stock.   By failing to reject the Marquez proposal outright defendants artificially depressed the value of Venoco stock, thereby depriving Plaintiff and the Class of the right to receive the maximum value for their shares.

60.     Defendants owe fundamental fiduciary obligations to Venoco's stockholders to take all necessary and appropriate steps to maximize the value of their shares. The Director Defendants have the responsibility to act independently so that the interests of the Company's public stockholders will be protected and to consider properly all *bona fide* offers for the Company and to immediately reject offers that are clearly not in the interest of shareholders, but instead, have been designed to benefit long-time board members.  Further, the directors of the Company must adequately ensure that no conflict of interest exists between the Director Defendants' own interests and their fiduciary obligations to maximize stockholder value or, if such conflicts exist, to ensure that all such conflicts will be resolved in the best interests of the Company's stockholders.

61.     Because the Director Defendants dominate and control the business and corporate affairs of Venoco and because they are in possession of private corporate information concerning Venoco's assets, businesses and future prospects, (especially Marquez) there exists an imbalance and disparity of knowledge of economic power between defendants and the public stockholders of Venoco.  This discrepancy makes it grossly and inherently unfair for the Special Committee -- whose identity has not been disclosed to Venoco shareholders -- to continue to consider the Proposed Transaction.

62.     The Director Defendants have breached their fiduciary and other common law duties owed to Plaintiff and other members of the Class in that they have not and are not exercising independent business judgment and have acted and are acting to the detriment of the Class.

63.     Plaintiff seeks preliminary and permanent injunctive relief and declaratory relief preventing defendants from inequitably and unlawfully depriving Plaintiff and the Class of their rights to realize a full and fair return for their stock at a premium that reflects the true value of the Company and to compel defendants to carry out their fiduciary duties to maximize shareholder value or, in the alternative, provide the Class with the appropriate measure of damages, which they will incur should the Proposed Transaction be consummated.

64.     Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury which defendants' actions threaten to inflict.

65.     Unless enjoined by the Court, defendants will continue to breach their fiduciary duties owed to Plaintiff and the members of the Class and will not only prevent the sale

of Venoco at a substantial premium, but facilitate the sale at an unfair price to a pre-ordained buyer, all to the irreparable harm of Plaintiff and other members of the Class.

66.     Plaintiff and the Class have no adequate remedy at law.

## COUNT I

## BREACH OF FIDUCIARY DUTY

67.     Plaintiff repeats and realleges all previous allegations as if set forth in full herein.

68.     By reason of the foregoing, the defendants have breached their fiduciary duties to Plaintiff and the Class under Delaware law or aided and abetted in the breach of those fiduciary duties.  Specifically, defendants have breached their duty of care by failing to consider any alternative whatsoever for Venoco other than the sale to an entity established by Marquez, and failing to consider selling Venoco to another buyer or having it remain independent.

## COUNT II

## INDEMNIFICATION

69.     Plaintiff repeats and realleges all previous allegations as if set forth in full herein.

70.     The defendants breached, *inter alia*, their fiduciary duties of care, loyalty and disclosure under Delaware law to the shareholders of Venoco.

71.     Plaintiff and members of the Class, as shareholders of Venoco, have been harmed by reason of the defendants' breaches of their fiduciary duty.

72.     As a result, defendants should be required to indemnify Plaintiff and members of the Class.

## COUNT III

## INJUNCTION

73.      Plaintiff repeats and realleges all previous allegations as if set forth in full herein.

74.      Plaintiff requests that the Court issue such injunctive orders as are necessary to restrain and enjoin defendants from consummating the Proposed Transaction.

**WHEREFORE**, plaintiff demands judgment as follows:

a)      Declaring that this action is properly maintainable as a class action and certifying plaintiff as the representative of the Class;

b)      Preliminarily and permanently enjoining defendants and their counsel, agents, employees, and all persons acting under, in concert with, or for them, from proceeding with, consummating, or closing the Proposed Transaction;

c)      In the event that the Proposed Transaction is consummated, rescinding it and setting it aside;

d)      Awarding compensatory damages against defendants, individually and severally, in an amount to be determined at trial, together with pre-judgment and post-judgment interest at the maximum rate allowable by law;

e)      Awarding plaintiff his costs and disbursements, including reasonable allowances for fees of plaintiff's counsel and reimbursement of expenses; and

f)      Granting plaintiff and the Class such other and further relief as the Court may deem just and proper.

Dated:  January 20, 2012

/s/Charles W. Lilley
Charles W. Lilley #9443
Karen Cody-Hopkins #35367 (Of counsel)
CHARLES LILLEY & ASSOCIATES P.C.
730 17th Street, Suite 670
Denver, CO 80202
Telephone:  (303) 293-9800
Facsimile:  (303) 298-8975
Email: clilley@lilleylaw.com
Email: karen@codyhopkinslaw.com


**WOLF HALDENSTEIN ADLER**
**  FREEMAN & HERZ LLP**
Gregory M. Nespole
Helena A. Lynch
270 Madison Avenue
New York, NY 10016
Telephone:  212-545-4600
Facsimile:  212-545-4605


*Attorneys for Plaintiff*


**LAW OFFICES OF MARC S. HENZEL**
Marc S. Henzel
431 Montgomery Ave. Suite B
Merion Station, PA 19066


Plaintiff's address:
SANJAY ISRANY
115 Heller Way
Montclair, NJ 07043